Case receded. The clerk call the next case please. 3-14-0197 R. Sherwin Prungao M.D. Appellant by Robert Chepenis v. Daniel Piper M.D. Appellate by Julie Tisher. Thank you. Mr. Chepenis. May it please the court, good afternoon Justice Wright, Justice McDade. I represent the plaintiff, Dr. Sherwin Prungao. Should we explain Justice Litton's absence? Oh, I'm sorry. Yes, Justice Litton is ill. He will be listening to the tapes of the oral argument this afternoon and will be a full participant in the processing of the case and will be part of the decision. Understood, thank you. This case is definitely one of the most unique ones that I've ever had. From a procedural standpoint, I would say it was downright scary. The interesting phenomenon in this case is that it involves information before the court today and before the trial court that the appellate courts and other courts today cannot be placed before any tribunal for any purpose whatsoever. And here we are talking about it. There are two different instances in this case where involving physician peer review in the context of a hospital medical staff. In this case, the defamation that is the subject of our complaint we have maintained all along is not peer review information. It was not generated in the course of peer review. It has nothing to do with peer review. The only thing connected with the defamatory allegation was the subject of peer review. It was absolutely false. It was not. On the other hand, there was another instance where my client was the subject of a peer review with medical staff. He's a general surgeon. They deal with death all the time. Their actions get reviewed. He was absolutely cleared in this case. Under Artisana and Anderson, as set forth in our brief, if he's cleared, that information, all information under the Medical Studies Act is absolutely barred from ever coming out. There has to be an ultimate finding resulting in adverse action against this doctor for any information whatsoever to come out. Otherwise, it's absolutely privileged. I didn't know there was a distinction between privileged and absolutely privileged until this case. But there is. It's ironclad as set forth in the Artisana and Anderson cases. So in this matter, the defamatory statement came out afterwards. My client was applying for hospital, falsely reported to both entities that my client, well after this investigation was closed, was the subject of an ongoing peer review that involved other action. And other action is defined as a formal reprimand or resignation while under investigation or termination of his relationship with the That statement on the part of Dr. Piper was absolutely false. We filed a suit for defamation. The statement, by the way, from Dr. Piper also referenced the prior peer review that could not be disclosed in any event because we'd already been cleared. At this point, it was undisputed. We did have to submit an objection to this letter being introduced. The court let it in and it's still there today. But the investigation that was closed, favorable result, was identified in the same letter where it said that there's this current investigation that didn't happen. That's why the complaint in this case, even though it's based on a document, did not have the document attached because we had the statute here that said we couldn't for any purpose. Not for our limited purpose, but for any purpose. So what we did, we filed a complaint detailing the allegations that were defamatory that were not connected to peer review. We also filed a motion for protective order so that the court could govern us through this with respect to how to deal with part that was absolutely privileged and part that wasn't. And it brings us here today. Now, the critical issue here is that Dr. Piper has essentially admitted that his statement regarding other actions against my client, other pending actions, and him being the subject of peer review as of May 28, 2013, was false. We see throughout the briefs continued references to the fact that Dr. Piper correctly stated some things, like that Dr. Prungo had no limitations on his privileges, that he was an active member of the staff, there was no disciplinary proceeding, no discipline ever taken against him, etc. Every time we read that in these briefs for the trial court and the appellate court, the thing that's left out is that the representation regarding pending other actions of the four types I specified was false. Dr. Prungo submitted an affidavit to the court saying that he was not the subject of peer review, that none of the four types of actions that were allegedly pending against him were pending, that it was false. Dr. Piper, on the other hand, in his affidavit, stated the limited things that were true, but did not address at all the same statement. So it stands uncontroverted right now that it was an absolute falsehood what Dr. Piper stated about Dr. Prungo. Nonetheless, Dr. Prungo, because of these statements being made, he was not... I understand what was false, that no final recommendation has been made is false? Because you're arguing on May 28, the date of the letter, a final That's why we like Borlaug. Right. It states that as a result of clinical concerns raised by the Surgical Care Committee, that was the first peer review. And the only peer review. When did that happen? In January, and it was concluded on February 6. January of what year? 13. And it was concluded when? February 6, 2013. That's in Dr. Prungo's affidavit, that he received the letter saying that it was concluded with no recommendation of adverse action. So that was over. And now it says that there's a new, a peer review committee was opened. So that's a separate committee from the Surgical Care Committee. This separate peer review committee never was convened. It never happened. This peer review that they say was open, with no final recommendation having been made, completely false. There was no second peer review. There was no recommendation forthcoming. And even if there was, the Medical Studies Act says that recommendations... Do you think the Surgical Care Committee is a peer review committee? It was a peer review committee that had completed its work. As of February 6, we have the letter in the record that it was done. And it's in Dr. Prungo's affidavit with the letter attached. I have a question while you're stopped. You keep saying pending other actions. Where does it say that it's pending? Why isn't he just talking about an other action that's finished? The other actions... First, the Surgical Care Committee review would be under a disciplinary action. And that's done the way the bylaws work. And it's extremely convoluted, but that's where there's a disciplinary proceeding that goes with peer review. And the disciplinary proceeding was underway and completed with no recommendation for anything against him. The other action is where it says that a review was opened. No final recommendation was made as of the date of the letter. That means it's ongoing. And so that was open according to Dr. Piper at the time this letter was written. And that separate peer review committee that was formed outside of the Surgical Care Committee, that's what we are saying never happened. And there was no investigation. This letter was false. We filed our complaint based on defamation, based on this statement. If you look at the very bottom, my eyes are getting bad, but I've memorized it. It defines what other action can be. And it's the four types. What's interesting here is that three of the four are impossible. It says at the top that he is an active member of the medical staff. So he could not have resigned while under investigation. That's impossible. That he was still with the hospital, termination of his relationship with the hospital for reasons related to competence and professional conduct, that's not something that can be the subject of an ongoing review. It either happened or it didn't. The formal reprimand, same way. It happens or it doesn't. And there's only one thing that can be the active participation in an impaired practitioner program, which never happened. But it's the only possible result based on the context of the letter that it could be. Regardless, the characterization that other action was taken in any event, any type of other action would be defamatory. Now, the next question becomes, is this statement protected by a peer review privilege? Well, the fundamental thing, and I think that the briefs we got off field, this is mentioned, but this is the basic issue. Does the peer review privilege and the peer review immunity, does that apply when it comes to medical practice? And here, in the affidavit Dr. Piper submitted in support of his motion to dismiss, he asserted that he had privileges and immunities based on peer review, hospital licensing and medical practice act. But he didn't identify this peer review that was underway. He didn't say who was on the committee, when it was convened, when it stopped, what they did, anything. Because it never happened. When we submitted our affidavit that said that this didn't occur ever, he left it uncontroverted. It's uncontroverted in the briefs. Everyone is on the same page. This never happened. So if the peer review never happened, and if the committee was never created, how can there be a privilege that he can invoke stating that our complaint should be dismissed with prejudice? It's his burden under Roche, specifically, to establish the peer review. He has to meet his burden to show that it was taking place. The only place that we've seen any assertion that a peer review was underway was in this letter, and it's not sworn. When we go to Dr. Piper's affidavit that he submitted in the course of this proceeding, that the peer review was even happening. He doesn't reference it. The trial court then dismissed our complaint with prejudice, giving privileges and immunities to the defendant, Dr. Piper, with nothing properly before the court saying that there was a peer review underway. And just adopted the position of the defendant generally. A large part of the order was just, I adopted the defendant's position. It was improper. Now... What about the releases? The releases are interesting. First, the position of the defendant is that if a party's name appears on a release, that makes the release effective. One of the releases has his name printed. He didn't even sign it. And that's why they say that his name appears on it, so it's effective. Now, I think it's elementary that the lack of a signature on a release would show that that release is ineffective. Plus, we have cited case law in here that says that a release of this nature needs to have specifically what is being released. We never released Dr. Piper from following the bylaws. Who prepared the releases? Those were prepared by one of the health care entities, Weatherby Locums, and was used for both Weatherby and St. Mary's. Did your client know they were being used? Sent out? He knew that one was being sent out to St. Mary's. And he had a contract with the medical staff that said, you won't disclose anything that's So he was protected. When he signed the release, he was protected by his bylaws. Did you just say, when he signed the release? One. One directed to one of them. But I'm saying that he didn't sign one with respect to the other, so this complaint shouldn't be dismissed with prejudice based on a release anyway. He could have released one, but not the other. But, and that's why they use the wording, the name appears on a release, instead of he signed it. But, releases such as this, I know there was a Ninth Circuit case cited, but there's Illinois law that says that the release has to be specific with respect to this, can't apply towards actions that haven't occurred, and in any event, he was already protected by the contract. Medical staff bylaws do form a contract between members of the medical staff and medical executive committee. And so Dr. Piper was bound to follow it. Why do we, this is maybe on an aside, but why do we have two releases for two different employers prepared by one entity? The locum's entity, my understanding, could use, submit different releases to different health care entities. I'm not positive as to exactly how they, it's some sort of an agency. But sometimes I know that eventually we did revoke our release, but. Okay, so if the client signed one release and handed it to locum. I don't recall if it was the St. Mary's release or the Weatherby release, but he signed one. But I want to point out. He delivered a signed release to locum and authorized locum? No, it's only given to locum. It wasn't for anyone else. And that's why there are multiple releases here. If it was just effective for, if Weatherby's release was effective for St. Mary's, there wouldn't be two releases. And here, I do not recall which one he signed. But in any event, he did not release Dr. Piper from doing what he did. Dr. Piper was. He may have released him for doing what he did as to one signed release, but not the other? No, even the signed release could not release Dr. Piper from liability for what he did. He could report about any number of different things. He couldn't lie. He couldn't make up stuff. He could take the records and report them. And so, but here, we just did not have a peer review to even address. Could he make a mistake? Excuse me? Any release? This wasn't a... He said he couldn't lie. Right. Here, there is an element of, in order to have the privilege, the case law of Muthuswani, I believe it's called, has a five-part test regarding good faith. Good faith would get him out of it. Here, Illinois law says that good faith can only be established, the Kopolevic case. The good faith necessary here can only be established if there was some showing of an investigation. Any kind of investigation. Here, there was no investigation whatsoever by Dr. Piper when he said this. He said, we've asserted he did no investigation. He has not come up with anything where he did investigate. He's taken our sworn statement and let it go. And that's critical under the analysis of the case I just mentioned. Good faith, Kopolevic, says that good faith cannot be established if there wasn't a showing of an investigation. And it was Dr. Piper's burden to show the investigation in order to give rise to the privilege. And since he didn't show any investigation, and we pointed that out, and he's never responded to that, there's never been any indication of any investigation whatsoever that mistakes goes outside of good faith. And there is a good faith element, I believe, that has to be complied with in order for a release to be effective. But in this case, if we get into the privileges and immunities, there still has not been anything establishing when this committee was created, who acted, what Dr. Piper's role was on the committee. Because he has to show that he was a member of the committee in order to get immunity. And he hasn't even shown that. There's nothing in the record saying that he had any function whatsoever or even what the committee was called. He just says there was a committee somewhere. He doesn't even say that they told him of a result or that there was an investigation underway. Absolutely nothing. So with that, again, it was Dr. Piper's burden to establish all five elements of the Muthuswani case. He established zero. And that's as a matter of law. Dismissal of prejudice, when none of the elements were established, is improper. We weren't given the opportunity to do discovery. We weren't given the protective order. All that happened to us in this case was that the court allowed insults to be added to injury by letting even more in when the underlying defamation was impermissible in the first place. And I see that I'm out of time. I've barely scratched the surface. Thank you. Ms. Tischer? Yes. Tischer. Good afternoon. Good afternoon. Julie Tischer on behalf of the defendant, Dr. Piper. Frankly, I'm not quite sure where to begin. There's been so much. Can you give me the February 6, 2013 date and whether that peer review has been concluded? The record doesn't indicate one date. One way or the other, Justice Wright. And part of my frustration with sitting here is a lot of what was just discussed is found no place in this record. There were many representations made as to dates, as to findings, as to statements that are not contained in this record. What we're here for is a defamation per se claim. That's it. It's not a violation of the Medical Studies Act. It's not a violation of medical staff bylaws. This is a defamation per se claim. So what we need to do is look at the letter that was written and determine as a matter of law whether it was defamatory per se. In defense, Dr. Piper has seven defenses that warrant dismissal in this case. Not one of them relies upon the Medical Studies Act. Plaintiff keeps wanting to talk about the Medical Studies Act and the immunity under the Medical Studies Act. We have not asserted any immunity under the Medical Studies Act. Every single one of our seven defenses is completely unrelated to the Medical Studies Act. We keep hearing about it in plaintiff's briefs and in argument and how it has to be a part of a peer review process. That has nothing to do with the basis for the dismissal in this case. Dr. Piper's dismissal was based on many things. The first was a qualified privilege. Qualified privilege is a common law creation. It has nothing to do with the Medical Studies Act. This state has determined that in certain favored circumstances, defendants have a qualified privilege that protects them from liability, immunity from liability, if those communications take place in favored circumstances. This is one of those favored circumstances. The Muthuswamy case establishes that, as does the Judge case. Just like here, medical professionals sending letters about other medical professionals. That's a qualified privilege that the common law has created. It has nothing to do with the Medical Studies Act. The innocent construction rule in the state of Illinois. The Illinois Supreme Court in Middleman has said, if the defamatory statement can be construed in a non-defamatory manner reasonably, it must be so construed. Again, that defense has nothing to do with the Medical Studies Act. It simply says, if you're accusing someone of defamation per se, which is a very rigorous standard, where harm is open and obvious on the face of the document you're claiming is defamatory per se, if that document is capable of one innocent construction, it is not actionable. And we're saying Dr. Piper's letter was capable of a very innocent construction. He wrote to these two hospitals and he said, Dr. Perengau is a general surgeon on staff at Galesburg Cottage Hospital. He has active privileges to operate on patients in our hospital. There are no restrictions on his privileges. If it's defamatory per se, it has to suggest that the defendant, the plaintiff, was incapable of performing as a surgeon, that he lacked skill, lacked ability. Dr. Piper didn't say that. He said, this doctor continues to practice at our hospital as an active operating surgeon. The innocent construction of that letter is just what it says. He was operating on patients at our hospital. He had active, unrestricted privileges. That innocent construction immunity has nothing to do with the Medical Studies Act. The letter itself is not defamatory per se. First, we need to make the initial point. Dr. Piper's letter doesn't say what Dr. Perengau claims he said. Dr. Perengau's action is based upon Dr. Piper's alleged representation that Dr. Perengau participated in an impaired practitioner program. Dr. Piper never said that. He didn't say that. You can't be guilty of defamatory per se if you didn't say the words that you're alleged to have said. And we don't have a he said, she said situation here. We have the letter. He did not say that. It was a category of other action in a footnote to the letter that was in no way referenced with respect to Dr. Perengau. So we have the qualified privilege of the innocent construction. We also have civil immunity under the Illinois Hospital Licensing Act and the Illinois Medical Practice Act. Can you go back to that point you just made? Are you claiming that the footnote can't be attributed to the author of the letter? No. I'm not saying that. I'm sorry. That's why I love arguing. I am not suggesting that, Your Honor. What I'm saying is that in addition to these other defenses, he didn't say the words, the words are not defamatory per se, they're capable of innocent construction, he's protected by a qualified privilege, the Illinois Hospital Licensing Act and the Illinois Medical Practice Act both specifically provide immunity for civil liability under these circumstances. And again, those statutes provide their own immunity. And the plain language of those statutes provides that no physician, no individual or member of a committee who participates in this type of process can be liable for civil damages. And there's a reason for that. That's because the state of Illinois has said the public interest in good medical care trumps an individual's right to file a civil lawsuit. We want to encourage these physicians to engage in this type of dialogue. When Dr. Perengau applies for privileges at two hospitals, those hospitals should have the ability to ask his current hospital, what are the status of his privileges? And Dr. Piper answered that question. He said he's an active surgeon, he's got full privileges at our hospital, and they're unrestricted. That type of communication is protected by this state and by the reviewing courts of this state. Do we have to reach qualified privilege if we find that the letter did not contain a defamatory statement per se? No. No. You don't. If he didn't say it, you don't get there. If what he said is not defamatory per se, and it wasn't, you don't get there. Nothing in his letter suggested the two categories of defamation per se that Plaintiff relies on. Plaintiff says this was defamatory. It suggested to his new hospitals that he lacked ability and lacked integrity in his profession. It says just the opposite. It says he's operating at our hospital with unrestricted privileges. So no, Justice, you don't. It's not defamatory. Even if it's defamatory, if we assume it's defamatory, he has all of these additional defenses. And as I said, the policy in this state could not be more clear. In the opening language of both the Illinois Hospital Licensing Act and the Illinois Medical Practice Act, the language begins with the fact that the state of Illinois has a public interest in promoting this type of dialogue. The Illinois Medical Studies Act is an act that deals with an evidentiary privilege. And usually that comes up in a case where a patient is suing a physician and says, I want to know if there were meetings about what happened to me. That's what the Medical Studies Act protects. What Dr. Piper said here didn't violate the Medical Studies Act in the first instance. He said that a peer review had been opened and no recommendation had been made. That doesn't violate the Medical Studies Act. The Medical Studies Act protects deliberations, the exchange of information, discussions, recommendations before a final outcome is made. Dr. Piper didn't discuss any of that in the letter. The fact of a peer review is not protected even under the Medical Studies Act. So the initial premise that we somehow violated the Medical Studies Act isn't even correct. He didn't reveal any of the deliberations that went on during any peer review process. He simply said that one existed. And we know that's not protected because the Illinois Supreme Court has approved standard interrogatories in a medical case that allow plaintiffs to ask just that question. Was there a review? Was there a meeting? If that's a standard approved interrogatory, it certainly isn't protected by a provision in the Medical Studies Act. The releases. Dr. Perengau admits signing the release on St. Mary's form. And that release specifically released any and all individuals providing information. I'll use a specific language. All individuals who provided information concerning staff appointments, capabilities to exercise privileges, competence, and quality improvement activities. That's exactly what Dr. Piper's letter covered. This whole process... Pardon me? It says also and all other. Yes. And any other matters that might directly or indirectly affect patients. Yes. This whole process was initiated by Dr. Perengau. He wanted privileges at these two hospitals. He had to sign a release in order to have Dr. Piper send this letter. He signed that release. That release does not lose its effectiveness because Dr. Perengau did not get the privileges that he sought. That release is still effective. It's concededly signed by Dr. Perengau. The trial court here had seven different bases to dismiss plaintiff's complaint. Any one of those, any one of those standing alone, was sufficient to warrant dismissal of this complaint. We would ask that this court affirm the trial court's order. Any other questions? Thank you. Thank you. Mr. Chapinis? I have a question for you. I know you have your thoughts organized, but I'm very good about throwing people off track right at the beginning. The Medical Studies Act prohibits bringing certain information through the courtroom doors, and that's what you find so troubling here. No, I find a lot more than that troubling. Okay. Well, that's one of the things. But had you not filed the defamation suit, none of that information would walk through the courtroom doors. No, and here's the distinction that I tried to make, and I know it's difficult. The Medical Studies Act only protects information generated in the course of peer review. The thing that was said about other actions here did not occur in the course of peer review, so it's not covered. The initial investigation where he was cleared, that was covered because it was an actual peer review process. The subject of our defamation suit is not, and it was their burden to show that it was, and they did nothing to show any peer review that was undertaken. And counsel is correct that the immunities that they rely upon aren't found in the Medical Studies Act. They are found in the Medical Practice Act and the Hospital License Act. That's absolutely true. And she said these are one of those favored circumstances where it applies. That's absolutely wrong. The favored circumstances are when there's a peer review that the person asserting the privilege has to show. Again, when did it start? When did it stop? Who participated? What was Dr. Piper's function? They refused to say. They will not say because it didn't happen. The only thing properly before the court is my client's affidavit that says it never happened, because he didn't participate in any of it, and he'd have to know if there was one of these things underway. So we have a sworn statement from Dr. Perongo stating that this never happened, and they have not... Tell me what you are referring to when you say this. The peer review, the ongoing review. You're talking about the impaired practitioner program. Well, just the other action general. The action referenced in that letter that says there's an ongoing review. That never happened. Dr. Piper said it in the letter, but when it came time to put his right hand up and swear under oath, he wouldn't do it, and he still won't. They still will not say what the other action was. They dance around it and say, well, yes, we said he had privileges. We said there was no discipline. Agreed? Agreed. I'm talking about the other action. What was the other action? They won't say. I know that your honors did not hear any explanation whatsoever from counsel regarding what the other action is. Now, with respect to this being one of those favored circumstances where there is this privilege and immunity, again, it's not. They have to establish the peer review. They did not establish peer review. They did not establish any procedure whatsoever. The statement that's most interesting to me, that you cannot be guilty of defamation per se unless you say the exact words, absolutely false. There's a new case, 2014, the Hadley case that I quoted, where someone referred to either a school board member or a potential school board member of being a Sandusky waiting to happen. That was in 2014. He lived across the street from a school. The court said, come on. We know this means Jerry Sandusky, who just went to prison for being a child molester. You didn't call him a child molester, but you said it's a Sandusky waiting to happen. So this assertion that exact words have to be spoken, absolutely false. In the brief, Dr. Piper states in the brief that we were somehow wrong because we didn't cite the Hadley case in our response to the motion to dismiss. It's because the Hadley case hadn't come out yet. It's a 2014 case, and this was briefed in 2013. The law didn't stop at that time. There have been additional cases that explain what defamation per se is, and the fact that Hadley came out more recently does not mean that it's bad law and doesn't apply here. It absolutely applies. Exact words do not have to be spoken. With respect to the immunities, counsel correctly stated that they apply to those who participate in this type of process. We agree. Privileges and immunities apply to those participating in the peer review process. There has to be a peer review process underway in order for that to happen. If Dr. Piper cannot come before this court and identify the peer review process or any function he had in it, it's not good enough. I believe it's the Knapp case that said that it's not good enough to say you're chief of staff, period. You have to say what your function was on the committee, how you were involved in the committee that gives you the right to say what you said. They haven't done that. There's no indication that Dr. Piper was a member of any committee. It's much like if I was in trial and then went to the appellate court and said, you know, the chief judge told me I was right on this. Well, the chief judge didn't hear the case. It doesn't matter that they're the chief judge. It matters which judge I appeared before who made the ruling. And here it was someone other than Dr. Piper. What could have happened here is that there was a grudge that was fulfilled by making a defamatory statement. What could have happened was someone slid a paper in front of Dr. Piper and told him to sign it. And he just did it willy-nilly. We don't know. But he still has to be the one to come forth and establish good faith. He has to be the one to establish what investigation he did. He hasn't done it. I go to counsel into explaining where it was, where this investigation was referenced or what he did. There's nothing. But with respect to the February 6th date, she said it's nowhere in the record. Yes, it is. Page 334, Affidavit of Sherwin-Perongo, Exhibit B, through a letter from Dr. Piper dated February 6, 2013, but dated February 7, 2013, on the second page. I was informed that the Surgical Care Committee concluded the investigation referenced in the letter submitted by Dr. Piper in conjunction with his motion to dismiss. The February 6th letter confirmed that the investigation was concluded with no recommendation that adverse action be taken against me. This letter contains information I cannot disclose pursuant to the Medical Studies Act, but a redacted version will be presented to the court upon request. He did everything he could here, and they never rebutted this. They had every opportunity. This stands as the fact that it's unrebutted, and the case never should have been dismissed, especially with prejudice. We should have the opportunity to conduct discovery. We should have the opportunity to flesh all this out, figure out why they said this thing about other action, what they meant. But in the course right now, all we know is that there's an allegation that there was peer review, and that something happened in the peer review that allowed them to discuss it. Anderson and Artisana both say you can't discuss this unless there's an adverse finding, or an ultimate finding that leads to adverse action. That's when you can bring up the existence of peer review. Until that happens, it can't come up. Therefore, Artisana and Anderson both say that there can be no revelation of any proceeding at all unless that threshold has been met. And if that threshold has been met, then the reader of the letter has to assume  Thank you. We thank both of you for your arguments this afternoon. We'll take the matter under advisement and we'll issue a written decision as quickly as possible. The court will now stand on brief recess for a panel change. All rise for a confidential recess.